Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| AIXA M. OLABARRIETA ARCHILLA<br><br>Recurrente<br><br>v.<br><br>SOLIMAR FLORENTINO LÓPEZ<br><br>Recurrida | KLRA202300388 | *CERTIORARI*<br>Procedente del Departamento de Asuntos del Consumidor<br><br>Querella Núm.: ARE-2022-3834<br><br>Sobre: Bienes Raíces (Ley 10 de 24-abril-1994, según enmendada) |
| --- | --- | --- |

Panel integrado por su presidenta, la Jueza Brignoni Mártir, el Juez Candelaria Rosa, la Jueza Álvarez Esnard y la Jueza Díaz Rivera.

## SENTENCIA

En San Juan, Puerto Rico, a 28 de septiembre de 2023.

Comparece ante nos Aixa M. Olabarrieta Archilla ("señora Olabarrieta" o "Recurrente") mediante escrito intitulado *Apelación-Revisión de decisión administrativa* presentado el 2 de agosto de 2023. En este, nos solicita que revoquemos la *Resolución*[1] emitida el 13 de marzo de 2023, notificada al día siguiente, por el Departamento de Asuntos del Consumidor ("DACo") en la cual el DACo declaró Sin Lugar la querella presentada y ordenó el archivo de la misma. Inconforme con el dictamen, la Recurrente presentó *Reconsideración*[2] la cual fue declarada No Ha Lugar mediante *Resolución en*

---

[1] Apéndice 2, págs. 5-12.
[2] Apéndice 12, págs. 40-41.

Número Identificador

SEN(RES)2023_____

*Reconsideración*[3] emitida el 30 de junio de 2023, notificada el 3 de julio del mismo año.

Por los fundamentos que exponemos a continuación, **CONFIRMAMOS** la *Resolución* recurrida.

## I.

Los hechos que dan origen a la presente reclamación surgen en febrero de 2022, cuando la Recurrente mostró interés de adquirir mediante compra la propiedad localizada en The Cluster Villa #14 Blue Line, en Vega Alta, Puerto Rico. El aludido inmueble pertenecía a Carlos Coreano ("señor Coreano") y Esther Vélez ("señora Vélez"), en conjunto ("Vendedores"). Surge del expediente que la Recurrente, junto a su esposo José Villanueva Valle ("señor Villanueva Valle") y su hijo José Villanueva Olabarrieta ("señor Villanueva Olabarrieta"), (en conjunto con la Recurrente "Compradores"), firmaron[4] el contrato de opción de compraventa ("contrato de opción")[5] objeto de la controversia entre estos y los Vendedores.

Conforme a los términos dispuestos en el contrato de opción, el precio de la propiedad acordado era $415,000 y los Compradores tenían un término de noventa (90) días para ejercer la opción de compra. Así las cosas, el 15 de febrero de 2022, la Recurrente le entregó a la señora Solimar Florentino, corredora de bienes raíces ("Recurrida" o "Corredora de bienes raíces") un cheque por la cantidad de cinco mil dólares

---

[3] Apéndice 1, págs. 1-4.
[4] Cabe destacar que la Recurrente firmó el aludido contrato de opción de compraventa el 10 de febrero de 2022, mientras que el señor Villanueva Valle, lo firmó el 11 de febrero del mismo año y su hijo, el señor Villanueva Olabarrieta al día siguiente. Por su parte, los Vendedores firmaron el acuerdo el día 15 de febrero de 2022.
[5] Apéndice 3, págs. 13-17.

($5,000.00) por concepto de depósito, el cual se deduciría de los gastos de cierre o del precio de venta de la propiedad.

Para fines del proceso de financiamiento hipotecario, la Recurrida le recomendó a la señora Olabarrieta que gestionara el mismo a través de la señora Margarita Rivera ("señora Rivera"). Obra en el expediente de autos que la Recurrente acogió la recomendación de la Recurrida y gestionó el financiamiento hipotecario a través de la señora Rivera.

Luego de ciertos trámites innecesarios de pormenorizar, el 25 de marzo de 2022, la Recurrida envió una comunicación vía correo electrónico[6] notificándole a la Recurrente la cancelación del contrato de opción por incumplimiento con el inciso 5 y cita en la misiva el texto de dicha sección. A ello, varios minutos después de enviada la referida comunicación, la Recurrente replicó[7] la misma mediante correo electrónico y solicitó que se discutiera el asunto. De igual forma, alegó no haber incumplido con los términos dispuestos en el contrato de opción y tener evidencia de que fue ésta quien estuvo dándole seguimiento a la persona recomendada por la Recurrida para el trámite del financiamiento hipotecario. Por su parte, la Recurrida respondió[8] a la comunicación recibida por parte de la Recurrente. En esta esbozó y aclaró que el cliente tenía siete (7) días para radicar la originación y noventa

---

[6] Si la compra de la propiedad estuviera condicionada a la obtención de un préstamo hipotecario, la PARTE OPTANTE (COMPRADORES) se comprometen a, dentro de los próximos 7 días laborables, a partir del otorgamiento de este contrato, iniciar el proceso de originación necesario para la compra de la propiedad, en la institución bancaria o financiera de su preferencia.

    a. La PARTE OPTANTE (COMPRADORES) acuerda que debe cumplirse con lo anterior, de lo contrario la propiedad podrá ser mercadeada, vendida a otro comprador y perderá el depósito entregado, así como el precio de venta acordado. Apéndice 3, inciso 5, pág. 14.

[7] Apéndice 5, pág. 20.
[8] Apéndice 5, pág. 20.

(90) días para completar el proceso hipotecario. Aludió que la Recurrente no cumplió con la presentación de los documentos requeridos para el proceso de originación. Por tanto, señaló que los Vendedores ya no interesaban continuar con el proceso debido a que no se cumplió con lo dispuesto en el contrato de opción de compraventa.

Así las cosas, la Recurrente por virtud de su representación legal, cursó dos misivas, la primera el 11 de abril de 2022[9] y la segunda el 3 de mayo del mismo año[10], requiriéndole a la Recurrida la devolución del depósito de cinco mil ($5,000.00) dólares entregados a la Corredora de bienes raíces a la firma del contrato de opción de compra.

Ante la no devolución del aludido depósito, la Recurrente presentó una querella[11] ante el DACo, Oficina Regional de Arecibo, en la cual solicitó la restitución del mismo, honorarios de abogado y la suspensión de la licencia de corredora de bienes raíces de la Recurrida.

El DACo realizó vista administrativa el 21 de diciembre de 2022 y emitió Resolución[12] el 13 de marzo de 2023, notificada al día siguiente. En esta esbozó las siguientes determinaciones de hechos:

1. La querellada Solimar Florentino es corredora de bienes raíces.
2. Allá en o para febrero de 2022 la querellante Aixa Olabarrieta estaba interesada en comprar una propiedad ubicada en The Cluster Villa #14 Ocean Blue Line, en Vega Alta, Puerto Rico.
3. Los dueños de la referida propiedad eran los señores Carlos Coreano y Esther Vélez.
4. La querellante, junto a su esposo José Villanueva Vale y su hijo José Villanueva Olabarrieta, firmaron

[9] Apéndice 6, pág. 23.
[10] Apéndice 7, pág. 24.
[11] Apéndice 8, págs. 25-28.
[12] Apéndice 2, págs. 5-12.

un contrato de opción de compraventa con los vendedores Carlos Coreano y Esther Vélez, en el cual la querellada Solimar Florentino sirvió de intermediaria como corredora de bienes raíces para la compra de la propiedad antes mencionada. Dicho contrato tiene fecha del 8 de febrero de 2022.

La querellante firmó el contrato de opción el día 10 de febrero de 2022. Su esposo y la querellada Solimar Florentino lo firmaron el 11 de febrero de 2022, y su hijo el 12 de febrero de 2022. Los vendedores firmaron el contrato de opción el 15 de febrero de 2022.

5. El precio de compraventa de la propiedad era de $415,000.00.

6. **La opción de compra era válida por un término de 90 días**.

7. El 15 de febrero de 2022 la querellante Aixa Olabarrieta le entregó a la querellada Solimar Florentino un cheque por la suma de $5,000.00 como depósito por concepto de opción de la propiedad, cuya cuantía sería aplicada al precio de venta o gastos de cierre.

8. La cláusula número 5 del contrato de opción dispone lo siguiente:

"Si la compra de la propiedad estuviera condicionada a la obtención de un préstamo hipotecario, la PARTE OPTANTE (COMPRADORES) se compromete a, dentro de los próximos **7 días laborables**, a partir del otorgamiento de este contrato, **iniciar** el proceso de originación necesario para la compra de la propiedad, en la institución bancaria o financiera de su preferencia.

   a. La PARTE OPTANTE (COMPRADORES) acuerda que debe cumplirse con lo anterior, de lo contrario la propiedad podrá ser mercadeada, vendida a otro comprador y perderá el depósito entregado, así como el precio de venta acordado".

9. Conforme la cláusula número 7 del contrato de opción, la compraventa si estaba sujeta a la aprobación de un préstamo hipotecario por parte de la querellante (compradores).

10. La querellante Solimar Florentino le recomendó a la querellante realizar las gestiones para el financiamiento hipotecario de la propiedad con la señora Margarita Rivera, quien estuvo presente en la propiedad el día que la querellante visitó la misma para inspección. La querellada le refirió a esta persona como una representante de banco u originadora de préstamos hipotecarios para realizar los procesos de obtención del préstamo.

11. La querellante coordinó con la señora Margarita Rivera el envío de documentos e información que ésta le solicitaba para el proceso de financiamiento. Ambas se mantuvieron en comunicación, mediante WhatsApp, desde el día 17 de febrero de 2022.

12. **No existe evidencia ni la querellante demostró haber cumplido fielmente con la entrega de todos los documentos requeridos o necesarios para la tramitación del financiamiento o proceso de originación del préstamo.**

   La querellante presentó como evidencia los mensajes que mantuvo con la Sra. Maribel Rivera pero no existe evidencia de los documentos que entregaba cuando se le solicitaba información y de que los documentos que enviaba cumplían con los[sic] requeridos[sic].

   Se desprende de los mensajes que a la fecha del 24 de febrero de 2022 la querellante aun no le había enviado a la Sra. Rivera toda la información requerida sobre su esposo. A la fecha del 14 de marzo de 2022 la misma querellante envía mensaje de que quedaba pendiente estados bancarios de José Villanueva y planilla del 2020.

13. **No existe evidencia ni la querellante demostró el estatus de su trámite de financiamiento ni de cualificación bancaria alguna.**

14. **No existe evidencia de documento bancario alguno sobre el proceso o trámite realizado.**

15. **No existe evidencia ni la querellante demostró fehacientemente haber cumplido con los trámites requeridos y/o necesarios para el proceso de originación del préstamo hipotecario.**

16. El 25 de marzo de 2022 la querellada Solimar Florentino le envió a la querellante un mensaje por correo electrónico, mediante el cual le notificó la cancelación del contrato, expresando que había incumplido con el inciso 5 del contrato y por lo cual le retenía el depósito.

   La querellante le respondió a la querellada mediante correo electrónico, alegando que no había incumplido con la documentación requerida, que siempre había estado dando seguimiento a la persona del banco que le había recomendado, que siempre estuvo dispuesta a continuar con el negocio pero que si se le cancelaba el negocio debía solicitar la devolución del dinero pagado como depósito.

   Luego el mismo día la querellada le envió a la querellante otro correo electrónico expresando que los 90 días eran para que el banco hiciera la transacción como tal pero que los 7 días eran para radicar la originación, que los documentos que había enviado a la representante del banco no eran legibles por lo que se le solicitó el envío por correo electrónico y al verificarse no estaba la documentación completa de todas las partes, y que el vendedor ya no quería seguir con la transacción porque no se había originado como estipula el contrato.

   La querellante le volvió a responder a la querellada que si no interesaba continuar con la transacción que se le devolviera su dinero.

> **17. El 25 de mayo de 2022 la querellante radicó en el DACO la querella de epígrafe, solicitando la devolución del dinero pagado como depósito.**

Conforme a ello, el DACo declaró No Ha Lugar la querella presentada por la señora Olabarrieta Archilla y ordenó su archivo.

Inconforme con el dictamen, la Recurrente, presentó el 3 de abril de 2023 escrito intitulado *Reconsideración*[13]. Como corolario de ello, el DACo emitió *Resolución Interlocutoria y Orden*[14], concediéndole a la Recurrida un término de veinte (20) días para exponer su posición en torno a la reconsideración presentada. En cumplimiento de la orden emitida, el 3 de mayo de 2023, la Recurrida sometió *Réplica a Reconsideración*[15].

Así las cosas, el DACo emitió *Resolución en Reconsideración*[16] el 30 de junio de 2023, notificada el 3 de julio del mismo año, en la cual declaró No Ha Lugar la reconsideración instada.

Insatisfecha aún, la Recurrente acude ante esta Curia mediante escrito intitulado *Apelación-Revisión de Decisión Administrativa* y le imputa al DACo haber incurrido en el siguiente error:

> Primer error: Erró DACo al desestimar la querella bajo la premisa que la querellante incumplió el contrato de opción de compraventa que redactó la querellada al alegar que la querellante no completó el "proceso de originación" del préstamo hipotecario dentro de los 7 días concedidos, que es básicamente imposible completarlo en ese término, cuando lo que requiere el contrato es que se comience el "proceso de originación".

---

[13] Apéndice 12, págs. 40 y 41.
[14] Apéndice 13, págs. 42 y 43.
[15] Apéndice 14, págs. 46-51.
[16] Apéndice 1, págs. 1-4.

Con el beneficio de la comparecencia de ambas partes, procedemos a exponer la normativa jurídica aplicable a la controversia ante nuestra consideración.

## II.

### A. *Estándar de Revisión Judicial de Determinaciones Administrativa*

"Es norma reiterada en nuestro ordenamiento jurídico que los tribunales apelativos debemos conceder deferencia a las decisiones de las agencias administrativas". *Torres Rivera v. Policía de PR,* 196 DPR 606, 626 (2016). Esto se debe "a la experiencia y el conocimiento especializado que éstas poseen sobre los asuntos que se les han delegado". *Íd.* Las determinaciones de una agencia administrativa gozan de una presunción de corrección. *Graciani Rodríguez v. Garage Isla Verde,* 202 DPR 117, 128 (2019). Al evaluar una determinación administrativa, los foros judiciales analizarán los aspectos siguientes: (1) si el remedio concedido por la agencia fue apropiado; (2) si las determinaciones de hecho que realizó la agencia están sostenidas por evidencia sustancial, y (3) si las conclusiones de derecho fueron correctas. *Capó Cruz v. Jta. de Planificación et al.,* 204 DPR 581, 591 (2020).

A tenor con lo anterior, los tribunales deben deferencia a las agencias administrativas salvo que: (1) las determinaciones no estén basadas en evidencia sustancial; (2) las conclusiones de derecho fueran incorrectas; (3) la agencia actuara de forma arbitraria, irrazonable o ilegal; o (4) que lesionara derechos fundamentales. *Super Asphalt v. AFI y otros,* 206 DPR 803, 14 (2021); *Rolón Martínez v. Supte. Policía,* 201 DPR 26, 36 (2018). En ausencia de ello, "aunque exista más de una interpretación

razonable de los hechos, procede que se valide la interpretación que realizó la agencia administrativa recurrida". *Super Asphalt v. AFI y otros, supra*; *ECP Incorporated v. OCS*, 205 DPR 268 (2020).

> Es decir, como excepción los tribunales pueden intervenir con las determinaciones de hechos de una agencia *cuando no están sustentadas por el expediente*, ya que el foro judicial no debe sustituir su criterio por el del foro administrativo si hizo una interpretación razonable de los hechos. *OCS v. Point Guard Ins.*, 205 DPR 1005, 1027 (2020). (Citas y comillas omitidas). (Énfasis suplido).

Aun así, "las determinaciones de derecho pueden ser revisadas en su totalidad". *Capó Cruz v. Jta. de Planificación et al., supra.*

### B. Teoría General de los Contratos

Es normativa reiterada que, los contratos son una fuente de obligación en nuestro ordenamiento jurídico.[17] *Universal Ins. v. Popular Auto*, 207 DPR 228, 238 (2021). Cónsono con ello, el contrato se ha definido como "el negocio jurídico bilateral por el cual dos o más partes expresan su consentimiento en la forma prevista por la ley, para crear, regular, modificar o extinguir obligaciones."[18] A su vez, se ha reconocido que, "[e]s facultativo contratar o no hacerlo." *Engineering Services v. AEE*, 209 DPR 1012, 1028 (2022); *PRFS v. Promoexport*, 187 DPR 42, 55 (2012). Es decir, si no existe la voluntad de obligarse, o fundamento razonable para concluir que esta existe, no surge un vínculo contractual. *Trinidad v. Chade*, 153 DPR 280, 293 (2001); refrendado en *Engineering Services v. AEE, supra.*

---

[17] Art. 1063 (b), Código Civil de 2020, 31 LPRA sec. 8984 (b).
[18] Art. 1230, Código Civil de 2020 31 LPRA sec. 9751.

Por su parte, los contratos se perfeccionan "desde que las partes manifiestan su consentimiento sobre el objeto y la causa, salvo en los casos en que se requiere el cumplimiento de una formalidad solemne o cuando se pacta una condición suspensiva."[19] Véase *Pérez Rodríguez v. López Rodríguez et at.*, 210 DPR 163, 186 (2022). Por consiguiente, para que un contrato exista y obligue a las partes debe cumplir con los siguientes elementos: (a) consentimiento de los contratantes; (b) objeto cierto que sea materia del contrato; y (c) causa de la obligación que se establezca.[20]

Por lo cual, una vez ha sido perfeccionado mediante la concurrencia de estos tres requisitos, "lo acordado en los contratos tiene fuerza de ley entre las partes".[21] Es desde entonces que las partes se obligan, "no solo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conforme a la buena fe, al uso y a la ley". *Aponte Valentín v. Pfizer Pharms., LLC*, 208 DPR 263, 285 (2021).

Vale destacar que en nuestra jurisdicción rige el principio de autonomía de la voluntad de las partes o la libertad contractual en virtud del cual "[l]as partes pueden acordar cualquier cláusula que no sea contraria a la ley, a la moral o al orden público."[22] *Engineering Services v. AEE, supra*, en la pág. 1027; *Feliciano v. Luxury Hotels Int'l of P.R. Inc.*, 210 DPR 712, 728 (2022). Como corolario de lo anterior, los tribunales

---

[19] Art. 1237, Código Civil de 2020, 31 LPRA sec. 9771.

[20] *Íd.* Art. 1213, Código Civil de 1930, 31 LPRA sec. 3391 (derogado).

[21] Art. 1233, Código Civil de 2020, 31 LPRA sec. 9754. Véase *Engineering Services v. AEE*, 209 DPR 1012, 1027 (2022); *Universal Ins. v. Popular Auto*, 207 DPR 228, 238 (2021).

[22] Art. 1232 del Código Civil de 2020, 31 LPRA sec. 9753.

estamos facultados para velar por el cumplimiento de los contratos, y no debemos relevar a una parte del cumplimiento de su obligación contractual cuando tal contrato sea legal, válido y no contenga vicio alguno. *Mercado, Quilichini v. UCPR*, 143 DPR 610, 627 (1997).

A su vez, la intención de las partes será el criterio fundamental para fijar el alcance de las obligaciones contractuales. *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 DPR 64, 69 (1983). Por lo cual, el Art. 354 del Código Civil de 2020, *supra*, en materia de interpretación del negocio jurídico se han reconocido las siguientes reglas:

> a. se presume que el negocio jurídico se otorga de buena fe; y
> b. si el negocio jurídico es unilateral, se atenderá al sentido literal de sus palabras, a no ser que aparezca claramente que fue otra la voluntad de su autor. En tal caso, se observará lo que parezca más conforme a la intención que tuvo al otorgarlo.
>
> **Si los términos de un negocio jurídico bilateral son claros y no dejan duda sobre la intención de las partes, se estará al sentido literal de sus palabras.**
>
> Si las palabras parecen contrarias a la intención evidente de las partes, prevalecerá la intención sobre lo expresado.
>
> Para determinar la intención en ambos casos, debe atenderse principalmente a la conducta de la parte, sea coetánea, posterior o aún anterior al otorgamiento del negocio jurídico. (Énfasis nuestro). 31 LPRA sec. 6342.

### C. El Contrato de Opción

El Código Civil de Puerto Rico, Ley Núm. 55-2020, 31 LPRA sec. 5311 *et seq.*, reconoce el contrato de opción de compra como un contrato válido en nuestro ordenamiento jurídico. El Artículo 1029 del Código Civil de 2020, *supra*, lo define como "el derecho que faculta a su titular para que decida durante un plazo determinado, mediante la manifestación de

su aceptación, el perfeccionamiento del contrato de compraventa que ha sido ya acordado en todos sus aspectos fundamentales y secundarios y a cuyo cumplimiento se mantiene comprometido el concedente durante el plazo prefijado."[23]

Por su parte, el Art. 1030 del Código Civil de 2020, *supra*, reglamenta los requisitos del título de constitución de la opción de compra. En específico, establece lo siguiente:

> El título de constitución, además de las estipulaciones y del domicilio a efectos de las notificaciones preceptivas y demás pactos que el constituyente o los constituyentes tengan por conveniente, debe contener, como mínimo, los siguientes requisitos:
>
> a. el plazo de duración del derecho y, si procede, el plazo para su ejercicio;
>
> b. en su caso, la voluntad del constituyente o de los constituyentes de configurar el derecho con carácter real;
>
> c. el precio o contraprestación para la adquisición del bien o los criterios para su fijación, cuando se trate de un derecho de opción a una adquisición onerosa, indicando el precio estipulado para su adquisición. Cuando se prevean cláusulas de estabilización, deben contener criterios objetivos y el precio debe poder fijarse con una simple operación aritmética; y
>
> d. la prima pactada para su constitución, cuando el derecho se constituye a título oneroso, indicando el precio convenido.
>
> […]. 31 LPRA sec. 8823.

A su vez, el tratadista Puig Brutau ha expresado que "no se opta por optar, sino que la opción es la posibilidad de perfeccionar un contrato previamente delimitado". J. Puig Brutau, Fundamentos de Derecho Civil, 2da ed., Barcelona, Ed. Bosch, 1982, T. II, Vol. 2, pág. 50.

Cónsono con lo anterior, en el contrato de opción es el optante quien ostenta la facultad de determinar, dentro del

---

[23] 31 LPRA sec. 8821.

plazo concedido, si perfecciona el contrato definitivo, es decir, el contrato por el cual optó. *Matos Lorenzo v. Rivera Tirado*, 181 DPR 835, 841 (2011). No obstante, dicho derecho queda extinguido con su renuncia o si transcurre el plazo concedido sin que el optante ejerza la opción —se estima entonces caducado. *Mayagüez Hilton Corp. v. Betancourt*, 156 DPR 234, 249 (2002).

De otra parte, se ha reiterado que "el alcance de la opción aludida no se puede fijar sin tomar en cuenta el contenido específico que en [el] contrato se le imparte". *Zeta Enterprises, Inc. v. ELA*, 145 DPR 1, 10 (1998). Por lo cual, hemos reconocido la posibilidad de que las partes convengan que el derecho de opción esté supeditado al cumplimiento de ciertas condiciones. *Íd.*

Ahora bien, si la opción se ejerce dentro del plazo acordado, el contrato de opción queda extinguido y a su vez se perfecciona el contrato aceptado. *Mayagüez Hilton Corp. v. Betancourt, supra*. Desde entonces, las partes vienen obligadas a satisfacer sus respectivas prestaciones bajo el contrato definitivo. *Matos Lorenzo v. Rivera Tirado, supra*, pág. 842.

De este modo, el contrato de opción tiene una naturaleza transitoria y puede ser aplicable a un sinnúmero de contratos, tales como el de compraventa, sociedad, arrendamiento de cosas y de servicios. *Mayagüez Hilton Corp. v. Betancourt, supra*, en las págs. 246-247.

    **(b) *Ley 10-1994, según enmendada, "Ley para Reglamentar el Negocio de Bienes Raíces y la Profesión de Corredor, Vendedor o Empresa de Bienes Raíces en Puerto Rico"***

La Ley Núm. 10 de 26 de abril de 1994, según enmendada, conocida como *"Ley para Reglamentar el Negocio de Bienes Raíces y la Profesión de Corredor, Vendedor o Empresa de Bienes Raíces en Puerto Rico"*, 20 LPRA sec. 3025 *et seq.*, primordialmente, reglamenta el ejercicio de la profesión de corredor de bienes raíces en Puerto Rico. Además, faculta al DACo a supervisar el negocio de bienes raíces en Puerto Rico y la venta en Puerto Rico de bienes raíces ubicados fuera de la jurisdicción de Puerto Rico.[24]

A la luz de lo anterior, la referida Ley le otorgó al DACo, entre otras facultades, considerar y adjudicar las querellas presentadas por los consumidores en contra de los corredores, vendedores o empresas de bienes raíces.[25] Asimismo, el DACo puede investigar reclamaciones resultantes de la comisión de actos o prácticas prohibidas proscritas por parte de los corredores, vendedores o empresas de bienes raíces.[26]

Conforme se define en el Artículo 1(g) de la Ley Núm. 10-1994, *supra*, el término "corredor de bienes raíces" se refiere a:

> "…la persona natural que, poseyendo una licencia para ejercer la profesión de corredor de bienes raíces expedida por la Junta, actúe como intermediario, mediante pago o promesa de pago de cualquier compensación mutua y previamente convenida, entre las partes que acuerden llevar a cabo en el Estado Libre Asociado de Puerto Rico una transacción de compraventa, promesa de venta, opción de compra o venta, permuta, arrendamiento, subasta, administración de propiedades, o en el ofrecimiento, promoción o negociación de los términos de una venta, opción de compraventa, promesa de venta, alquiler, administración, permuta de bienes inmuebles localizados en o fuera del Estado Libre Asociado de Puerto Rico. Sin embargo, no se considerará ejercer la profesión de bienes raíces para propósitos de este capítulo, cualquier tipo de transacción relacionada con

---

[24] Art. 23 de la Ley Núm. 10 de 26 de abril de 1994, según enmendada, conocida como *"Ley para Reglamentar el Negocio de Bienes Raíces y la Profesión de Corredor, Vendedor o Empresa de Bienes Raíces en Puerto Rico"*, 20 LPRA sec. 3046.
[25] *Íd.,* 20 LPRA sec. 3046 (d).
[26] Art. 31 de la Ley Núm. 10-1994, *supra*, 20 LPRA sec. 3054.

la compra, venta, alquiler, permuta, subasta o administración de un bien inmueble en la que él sea titular de dicho bien inmueble y actúe en beneficio propio y no como intermediario entre dos (2) clientes."
20 LPRA sec. 3025.

Por su parte, se define la "transacción de bienes" como "cualquier contrato, de compraventa, promesa de venta, opción de compra o venta, permuta, arrendamiento, subasta, administración de propiedades, o el ofrecimiento, promoción o negociación de los términos de una venta, opción de compraventa, promesa de compraventa, alquiler, subasta, administración, permuta de bienes inmuebles localizados en o fuera del Estado Libre Asociado de Puerto Rico, donde sirva de intermediario un Corredor, Vendedor o Empresa de Bienes Raíces."[27]

A su vez, el inciso (i) del Artículo 2 de la mencionada Ley define el concepto "depósito" como "la suma de dinero que un Comprador entrega a un Corredor, Vendedor o Empresa de Bienes Raíces antes de efectuarse una transacción de bienes raíces, relacionada con un bien inmueble localizado en o fuera del Estado Libre Asociado de Puerto Rico a los fines de que éste inicie las diligencias necesarias para que dicha transacción se realice."[28]

Ahora bien, entre los actos o prácticas reguladas por la Ley Núm. 10-1994, *supra*, a los corredores y empresas de bienes raíces, se prohíbe incurrir, o inducir a otra persona a incurrir, en cualquiera de los actos o prácticas que se enumeran en el Artículo 31.[29] En lo pertinente, el inciso 11 de

---

[27] 20 LPRA sec. 3025(t).
[28] 20 LPRA sec. 3025(i).
[29] 20 LPRA sec. 3054.

esta disposición expresamente prohíbe la retención de cualquier depósito cuando no se lleve a cabo la transacción o gestión objeto de dicho depósito sin que haya culpa del comprador.[30] A tales efectos, el precitado artículo dispone lo siguiente:

> Por la presente se proscriben los siguientes actos o prácticas específicas:
>
> Se prohíbe a toda persona sujeta a las disposiciones de esta Ley incurrir, o inducir a otra persona a incurrir, en cualquiera de los actos o prácticas que se enumeran a continuación:
>
> > [...]
> >
> > (2) Retener indebidamente cualquier documento o cantidad de dinero de las partes.
> >
> > [...]
> >
> > (11) **Retener cualquier depósito cuando no se lleve a cabo la transacción o gestión objeto de dicho depósito sin que haya mediado culpa del comprador.** Se entenderá que no hay culpa del comprador cuando la institución financiera le deniegue el financiamiento al comprador por éste no haber cualificado para otorgar y perfeccionar una transacción de bienes raíces, luego de haber cumplido cabalmente con otros requisitos de ley y obligaciones propias de este tipo de negocio. **No obstante, se entenderá que hay culpa del comprador** cuando éste miente, **intencionalmente omita o retrase la entrega de información**, voluntariamente tome un préstamo o asuma una obligación durante el proceso de solicitud del financiamiento, con la intención de que se le deniegue el financiamiento. Copia del documento que señale la denegación será entregada por el comprador al corredor de bienes raíces contratado. Esta prohibición no aplicará en los casos en que una vez el financiamiento sea concedido, el comprador no culposo decida no aceptar el mismo, y esta decisión del comprador no culposo provoque que la transacción de bienes raíces se dé por concluida.
> >
> > [...]. (Énfasis nuestro). 20 LPRA sec. 3054.

Por consiguiente, la Ley Núm. 10-1994, *supra*, establece que únicamente puede retenerse el depósito entregado en ocasión de un contrato de opción de compra o de compraventa

---

[30] 20 LPRA sec. 3054(11).

realizado por mediación de un corredor de bienes raíces, cuando medie culpa del comprador. Esto, tiene el efecto de impedir que se consuma el contrato de opción o compraventa. Cualquier "pacto de retención de depósito incondicional es contrario a la ley y, por consiguiente, nulo". *Vélez López v. Izquierdo Stella*, 162 DPR 88, 99 (2004).

Nuestro Tribunal Supremo ha sido enfático y reiteró en *Vélez López v. Izquierdo Stella*, *supra*, que el pacto para retener el depósito en contratos donde ha mediado un corredor de bienes de raíces no es contrario a la ley per se. "Se puede estipular siempre que se provea que para ello debe mediar culpa del comprador en la no realización de la transacción." *Íd.,* a la pág. 99.

**III.**

Expuesto el marco jurídico y ponderados los argumentos presentados por las partes, procedemos a resolver la controversia ante nuestra consideración.

En síntesis, la Recurrente arguye que DACo erró al desestimar la querella instada por esta. En particular, sostuvo que no incumplió el contrato de opción de compraventa otorgado entre las partes. De igual forma, arguyó que lo dispuesto en el aludido contrato únicamente establecía que la Recurrente tenía que comenzar el proceso de originación del préstamo hipotecario dentro del término de siete (7) días contados a partir del otorgamiento del contrato. Por tanto, alegó que el contrato de opción no requería que se completara el proceso de originación.

Por su parte, la Recurrida esbozó que la señora Olabarrieta incumplió con la cláusula a la que se refiere como número cinco (5) del contrato suscrito entre la Recurrente, el señor Villanueva Valle, el señor Villanueva Olabarrieta y los Vendedores. A consecuencia de lo anterior, arguyó que la Recurrente no originó el trámite hipotecario dentro del término de siete (7) días laborables, ya que no "existe evidencia ni la recurrente demostró haber cumplido fielmente con la entrega de todos los documentos requeridos o necesarios para la tramitación del financiamiento o proceso de originación del préstamo".[31] Como corolario de ello, sostuvo la razonabilidad de la determinación del DACo.

Obra en el expediente de autos, el referido contrato de opción de compraventa.[32] Luego de un detenido y ponderado análisis de este, podemos determinar que conforme al Inciso VI (4)[33] las partes acordaron entregar un depósito por la cantidad de cinco mil dólares ($5,000.00). Así las cosas, la Recurrente entregó a la Recurrida un cheque por dicha cantidad por concepto de depósito. Además, se desprende del contrato, particularmente el Inciso VI (5), que la partes acordaron en qué circunstancias procedía la retención del depósito sometido. Al respecto, la aludida cláusula dispone lo siguiente:

> "**Si la compra de la propiedad estuviera condicionada a la obtención de un préstamo hipotecario, la PARTE OPTANTE** (COMPRADORES) se compromete a, dentro de los próximos **7 días laborables**, a partir del otorgamiento de este contrato, **iniciar** el proceso de originación necesario para la compra de la

---

[31] Oposición a Revisión Judicial, inciso 13, pág.3

[32] Apéndice 3, pág. 13-17.

[33] La PARTE OPTANTE (COMPRADORES) entrega como opción la cantidad de $5,000.00 como depósito de buena fe. Dicha opción se le entregará a la CORREDORA de Bienes Raíces hasta tanto se realice la transacción de la referida propiedad y será acreditado al precio de venta o gastos de cierre. *Íd.,* pág. 14.

propiedad, en la institución bancaria o financiera de su preferencia.

    a. La PARTE OPTANTE (COMPRADORES) acuerda que **debe cumplirse con lo anterior, de lo contrario la propiedad podrá ser mercadeada, vendida a otro comprador y perderá el depósito entregado**, así como el precio de venta acordado". (Énfasis nuestro).[34]

Conforme a lo antes expuesto, el contrato en el Inciso VI (7) dispone además que los Compradores tienen la responsabilidad de "hacer todo lo que este a su alcance para agilizar el préstamo y no mediar de forma negligente".[35] De igual forma, quedó claramente estipulado que,

> NO será considerado justa causa: (a)dejar de proveer información necesaria, (b)**retrasos voluntarios en la entrega de documentos,** (c)no tener los fondos disponibles para el cierre, (d) no poderse verificar los ingresos, (e)**voluntariamente no cumplir con los términos pactados**, (f)cambio de empleo u otras razones personales-durante el término de la opción-que le descalifiquen.".[36]

A esos fines es preciso destacar que el contrato de opción de compraventa fue firmado por los otorgantes en diversas fechas, siendo la última el **15 de febrero de 2022**, fecha en que firmaron los Vendedores[37]. Por consiguiente, al amparo del Inciso VI (5) del aludido contrato, la Recurrente tenía un término de siete (7) días laborables a partir del **15 de febrero de 2022** para iniciar el proceso de originación para la compra de la propiedad en la institución bancaria de su preferencia.

En lo pertinente a la controversia ante nuestra consideración, la Recurrida alegó que la Recurrente incumplió con los términos dispuestos en el contrato, por tanto, le notificó mediante comunicación escrita el 25 de marzo de 2022, la

---

[34] *Íd.,* pág. 14.
[35] *Íd.,* pág. 15.
[36] *Íd.,* pág. 15.
[37] *Íd.,* pág. 17.

cancelación del contrato y la retención del depósito[38], al amparo del Inciso VI (5) del contrato de opción de compraventa.

Ante la negativa de la Recurrida de devolverle el depósito a la Recurrente, esta instó una querella[39] ante el DACo. En síntesis, el DACo realizó una vista administrativa el 21 de diciembre de 2022. Evaluada la prueba presentada emitió *Resolución*[40] en la que declaró SIN LUGAR la querella presentada y ordenó el archivo del caso. En esta, emitió diecisiete (17) determinaciones de hecho, entre las que es preciso destacar las siguientes:

...

12. **No existe evidencia ni la querellante demostró haber cumplido fielmente con la entrega de todos los documentos requeridos o necesarios para la tramitación del financiamiento o proceso de originación del préstamo.**

La querellante presentó como evidencia los mensajes que mantuvo con la Sra. Maribel Rivera pero no existe evidencia de los documentos que entregaba cuando se le solicitaba información y/o de que los documentos que enviaba cumplían con los requeridos.

Se desprende de los mensajes que a la fecha del 24 de febrero de 2022, la querellante aun no le había enviado a la Sra. Rivera toda la información requerida sobre su esposo. A la fecha del 14 de marzo de 2022 la misma querellante envía mensaje de que quedaba pendiente estados bancarios de José Villanueva y planilla del 2020.

13. **No existe evidencia ni la querellante demostró el estatus de su trámite de financiamiento ni de cualificación bancaria alguna**.

14. **No existe evidencia de documento bancario alguno sobre el proceso o tramite realizado**. [41]

...

A la luz de lo anterior, nos es forzoso concluir que el DACo no erró al determinar improcedente la querella. De las determinaciones de hecho realizadas por el DACo surge que la señora Olabarrieta no probó su caso mediante preponderancia

---

[38] Apéndice 5, págs. 20-22.
[39] Apéndice 8, págs. 25-28.
[40] Apéndice 2, págs. 5-12.
[41] Apéndice 2, págs. 6-7

de prueba, que ésta no presentó prueba que demostrara que cumplió con las disposiciones del contrato de opción de compraventa, particularmente con someter los documentos requeridos para el proceso de originación.

En nuestro ordenamiento, las determinaciones de una agencia administrativa gozan de una presunción de corrección. *Graciani Rodríguez v. Garage Isla Verde, supra.* Es por ello que, como foro revisor, debemos evaluar si: 1) las determinaciones no están basadas en evidencia sustancial; (2) las conclusiones de derecho fueron incorrectas; (3) la agencia actuó de forma arbitraria, irrazonable o ilegal; o (4) que lesionara derechos fundamentales. *Super Asphalt v. AFI y otros, supra.* En ausencia de ello, "aunque exista más de una interpretación razonable de los hechos, procede que se valide la interpretación que realizó la agencia administrativa recurrida". *Id.*

Por los fundamentos que anteceden, del expediente de este caso no se desprende que el DACo haya abusado su discreción o haya actuado de manera arbitraria, irrazonable o ilegalmente. A esos fines entendemos que no existe justa causa para la devolución del depósito.

De igual forma, no podemos colegir con los planteamientos esbozados por la Recurrente en torno al término dispuesto en el contrato de opción de compraventa sobre el proceso de originación. Es su contención que es imposible de completar dicho proceso en el término dispuesto en el aludido contrato. Como se puede apreciar, el contrato de opción de compraventa fue firmado libre y voluntariamente. Nuestro Tribunal Supremo ha sido consistente y enfático en

que los contratos tienen fuerza de ley entre las partes. *Universal Ins. v. Popular Auto, supra*; *Rodríguez García v. UCA,* 200 DPR 929, 943 (2018); *Oriental Bank v. Perapi et al.,* 192 DPR 7, 15 (2014). Y es que, tal y como señalamos cuando el contrato sea legal, válido y no contenga vicio alguno, las partes se encuentran obligadas a su cumplimiento. Después de todo, a los tribunales les corresponde a velar por el cumplimiento de los contratos suscritos entre las partes dentro de su autonomía de voluntad. Véase *Mercado, Quilichini v. UCPR, supra.*

Conforme a lo antes esbozado determinamos que la Recurrente no demostró que DACo actuó de manera arbitraria o ilegal, o en forma tan irrazonable que su determinación constituyó un abuso de discreción al denegar su causa. Establecido lo anterior, la determinación del DACo amerita nuestra deferencia. Por tanto, determinamos que no erró el DACo en desestimar la querella instada por la Recurrente.

**IV.**

Por los fundamentos expuestos, **CONFIRMAMOS** la determinación recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones